1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ALPHONSO HAYDEN, JR.,                    No.  2:14-cv-1004 WBS DB P

12                  Petitioner,

13        v.                                  FINDINGS AND RECOMMENDATIONS

14   ROBERT W. FOX, Warden,[1]

15                  Respondent.

16

17        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   under 28 U.S.C. § 2254.  Petitioner challenges his 2001 conviction on five counts of robbery,

19   which ultimately resulted in a sentence of forty-six years to life. Respondent moves to dismiss the

20   habeas petition as time-barred.  Petitioner argues that he is entitled to equitable tolling on grounds

21   of mental illness. On November 12, 2019, the Court held an evidentiary hearing at which

22   petitioner's appointed counsel and respondent's counsel each presented evidence regarding

23   petitioner's mental health. Following the hearing, the parties were granted one final opportunity

24   to submit any further arguments related to respondent's motion to dismiss. After carefully

25   reviewing the record and for the reasons set forth below, the undersigned will recommend that

26   respondent's motion be granted.

27   _____

28   [1] Robert W. Fox, current warden of the California Medical Facility, is substituted as respondent.
     See Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994).

                                              1

1    **I.      Procedural History**

2         The procedural history of this case derives from the operative first amended petition for

3    writ of habeas corpus ("FAP," ECF No. 9), and documents lodged with the Court by respondent

4    (see ECF No. 24).

5         On May 22, 2001, a Sacramento County Superior Court jury found petitioner guilty of

6    five counts of first-degree robbery, in violation of California Penal Code § 211.  In a bifurcated

7    trial, the jury then found true allegations that, in 1988, petitioner had received two federal bank

8    robbery convictions.  Based on the conviction and findings, petitioner was sentenced to state

9    prison for a term of 130 years to life, consisting of five consecutive terms of 25 years to life, with

10   an additional five years in sentencing enhancements based on the 1988 convictions.  (Lod. Doc.

11   No. 2; People v. Hayden, No. C038685, 2002 WL 31105409, 2002 Cal. App. Unpub. LEXIS

12   8862 (Cal. Ct. App. Sep. 23, 2002)).  Petitioner appealed his conviction.

13        On September 23, 2002, the California Court of Appeal for the Third Appellate District

14   issued an unpublished opinion affirming the judgment of conviction but vacating the sentence and

15   remanding the matter for resentencing. Id. On January 8, 2003, upon remand, the Sacramento

16   County Superior Court resentenced petitioner to 25 years to life on count one, 10 years on count

17   two, 2 years each on counts three, four, and five, and a five-year sentencing enhancement, for a

18   total sentence of 46 years to life. (Lod. Doc. No. 4, People v. Hayden, No. C043054, 2002 WL

19   22205940 (Cal. Ct. App. Sep. 24, 2003).) Petitioner appealed his resentencing.

20        On September 24, 2003, the California Court of Appeal for the Third Appellate District

21   issued an unpublished opinion directing the trial court to correct petitioner's offenses from first to

22   second degree robbery, modifying the judgment to include certain fines and penalty assessments,

23   and affirming the judgment in its modified form. Id.

24        Petitioner subsequently filed four petitions for writs of habeas corpus: on October 23,

25   2003, with the California Supreme Court; on November 23, 2004, with the Sacramento County

26   Superior Court; on April 13, 2013, with the California Supreme Court; and on June 1, 2013, with

27   the Sacramento County Superior Court.  (Lod. Doc. Nos. 5, 7, 9, 11.)  Each of these petitions was

28   denied.  (Lod. Doc. Nos. 6, 8, 10, 12.)  On October 19, 2013, petitioner filed a petition for writ of

1   habeas corpus with the California Court of Appeal for the Third Appellate District, which was

2   denied on November 7, 2013.  (Lod. Doc. Nos. 13, 14.)  On December 7, 2013, petitioner filed a

3   petition for writ of habeas corpus with the California Supreme Court, which was denied on

4   February 26, 2014.  (Lod. Doc. Nos. 15, 16.)

5        On April 19, 2014, petitioner filed a petition for writ of habeas corpus with this court,

6   thereby commencing this action. On September 26, 2014, the court, after completing an initial

7   screening, dismissed the petition, but granted petitioner leave to file an amended petition. On

8   October 23, 2015, petitioner filed the operative FAP. (ECF No. 9.) Petitioner therein seeks federal

9   habeas relief on the grounds that his rights under the U.S. Constitution were violated by the

10  following: instructional errors, evidentiary errors, error related to the imposition of a five-year

11  enhancement, error related to the restitution order, Batson error, insufficiency of evidence, error

12  related to the failure to include a lesser-included offense, ineffective assistance of counsel, error

13  regarding the denial of a competency hearing, and error when the trial court failed to consider

14  mitigating evidence.

15       On February 26, 2015, respondent moved to dismiss the petition as time-barred.  (ECF

16  No. 22.)  Petitioner opposes the motion. (ECF No. 28.) Respondent has filed a reply.  (ECF No.

17  29.) Petitioner then filed a sur-reply. (ECF No. 42.)

18       Due to petitioner's claimed mental impairment, the undersigned appointed the Federal

19  Defender to represent petitioner for the purpose of responding to the motion to dismiss. (ECF No.

20  47.) This appointment order directed counsel for petitioner to file a motion if she determined that

21  evidence supporting petitioner's argument for equitable tolling can only be presented through an

22  evidentiary hearing. Following multiple stipulations to extend the time for a response, petitioner

23  filed a motion for an evidentiary hearing on May 14, 2018. (ECF No. 64.) On July 16, 2018, the

24  undersigned granted the motion in part, and an evidentiary hearing was set to hear testimony only

25  from a mental health expert regarding petitioner's mental health records from 2001 to 2013 and

26  an expert on the California Department of Corrections and Rehabilitation's ("CDCR") diagnostic

27  and treatment processes during that same period. (ECF No. 69.)

28

1   The evidentiary hearing was ultimately held on November 12, 2019. Federal Defender

2   Hannah Labaree appeared for petitioner, and Deputy Attorney General Justin Riley appeared for

3   respondent. Dr. Deserie Barragan, Psy.D., testified for petitioner, and Dr. Cheryl Paizis, D.O.,

4   testified for respondent.[2] Upon conclusion of the evidentiary hearing, the parties were directed to

5   file supplemental briefing limited to the relevance of any evidence and/or expert testimony

6   offered by the parties at the evidentiary hearing. (ECF No. 82.) The parties' timely briefs

7   followed. (ECF Nos. 83-84.)

8   Respondent's motion to dismiss is now fully briefed and ready for disposition.

9   **II.     Standards**

10   **A.     Standard re: Motion to Dismiss**

11   Rule 4 of the Rules Governing Section 2254 Cases allows a district court to dismiss a

12   petition if it "plainly appears from the face of the petition and any exhibits annexed to it that the

13   petitioner is not entitled to relief in the district court. . . ." Id.  The Court of Appeals for the Ninth

14   Circuit construes a motion to dismiss a habeas petition as a request for the court to dismiss under

15   Rule 4 of the Rules Governing § 2254 Cases.  See O'Bremski v. Maass, 915 F.2d 418, 420 (9th

16   Cir. 1991).  Accordingly, the court will review respondent's motion to dismiss pursuant to its

17   authority under Rule 4.

18   In ruling on a motion to dismiss, the court "must accept factual allegations in the [petition]

19   as true and construe the pleadings in the light most favorable to the non-moving party." Fayer v.

20   Vaughn, 649 F.3d 1061, 1064 (9th Cir. 2011) (quoting Manzarek v. St. Paul Fire & Marine Ins.

21   Co., 519 F.3d 1025, 1030 (9th Cir. 2008)).  In general, exhibits attached to a pleading are "part of

22   the pleading for all purposes . . . ." Hartmann v. Cal. Dept. of Corr. and Rehab., 707 F. 3d 1114,

23   1123 (9th Cir. 2013) (quoting Fed. R. Civ. P. 10(c)).

24   ////

25   ////

26   ////

27

28   [2] Dr. Paizis's brief testimony had minimal value in support of respondent's motion to dismiss, and it was therefore not considered by the Court.

4

1

**B.     AEDPA Statute of Limitations and Tolling**

2          On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996

3    ("AEDPA") was signed into law.  AEDPA amended 28 U.S.C. § 2244 by adding the following

4    provision:

5                    (d)(1)  A 1-year period of limitation shall apply to an application for
                a writ of habeas corpus by a person in custody pursuant to the
6                judgment of a State court.  The limitation period shall run from the
                latest of –
7
8                        (A) the date on which the judgment became final by the
                conclusion of direct review or the expiration of the time for seeking
9                such review;

10                       (B) the date on which the impediment to filing an application
                created by State action in violation of the Constitution or laws of the
11               United States is removed, if the applicant was prevented from filing
                by such State action;
12
                         (C) the date on which the constitutional right asserted was
13               initially recognized by the Supreme Court, if the right has been newly
                recognized by the Supreme Court and made retroactively applicable
14               to cases on collateral review; or

15                       (D) the date on which the factual predicate of the claim or
                claims presented could have been discovered through the exercise of
16               due diligence.

17               (2) The time during which a properly filed application for State post-
                conviction or other collateral review with respect to the pertinent
18               judgment or claim is pending shall not be counted toward any period
                of limitation under this subsection.
19

20          This one-year AEDPA statute of limitations applies to all federal habeas corpus petitions

21   filed after the statute was enacted.  See Lindh v. Murphy, 521 U.S. 320, 322-23 (1997).

22   However, state prisoners "whose convictions became final prior to AEDPA's enactment, had a

23   one-year grace period in which to file their petitions."  Patterson v. Stewart, 251 F.3d 1243, 1245

24   (9th Cir. 2001) (citing Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1286 (9th

25   Cir.1997).  See also Waldron-Ramsey v. Pacholke, 556 F.3d 1008, 1011 (9th Cir. 2009)

26   ("Because Waldron-Ramsey's state conviction was finalized before AEDPA's enactment on

27   April 24, 1996, his deadline to file a habeas petition under AEDPA was April 23, 1997."); Miles

28   v. Prunty, 187 F.3d 1104, 1105 (9th Cir. 1999) ("Accordingly, a prisoner with a state conviction

5

1  finalized before April 24, 1996, such as Miles, had until April 23, 1997 to file a federal habeas
2  petition.")

3        **A. Statutory Tolling**

4        The limitations period is statutorily tolled during the time in which "a properly filed
5  application for State post-conviction or other collateral review with respect to the pertinent
6  judgment or claim is pending." 28 U.S.C. § 2244(d)(2). A state petition is "properly filed," and
7  thus qualifies for statutory tolling, if "its delivery and acceptance are in compliance with the
8  applicable laws and rules governing filings." Artuz v. Bennet, 531 U.S. 4, 8 (2000). Generally,
9  this means that the statute of limitations is tolled during the time after a state habeas petition has
10  been filed, but before a decision has been issued. Nedds, v. Calderon, 678 F.3d 777, 780-81 (9th
11  Cir. 2012). However, "[a] petitioner who unreasonably delays in filing a state habeas petition
12  would not be granted the benefit of statutory tolling because the petition would not be considered
13  pending, or properly filed, within the meaning of § 2244(d)." Id. at 780 (internal quotations and
14  citations omitted).

15        Additionally, the limitations period is not tolled for the period between finality of the
16  appeal and the filing of an application for post-conviction or other collateral review in state court
17  since no state court application is "pending." Nino v. Galaza, 183 F.3d 1003, 1006-07 (9th Cir.
18  1999) overruled on other grounds by Carey v. Saffold, 536 U.S. 214, 225-27 (2002) (holding a
19  California habeas petitioner who unreasonably delays in filing a state habeas petition is not
20  entitled to the benefit of statutory tolling during the gap or interval preceding the filing).

21        State habeas petitions filed after the one-year statute of limitations has expired do not
22  revive the statute of limitations and have no tolling effect. Ferguson v. Palmateer, 321 F.3d 820,
23  823 (9th Cir. 2003) ("section 2244(d) does not permit the reinitiation of the limitations period that
24  has ended before the state petition was filed"). The filing of a federal habeas petition does not toll
25  the statute of limitations. Duncan v. Walker, 533 U.S. 167, 181-82 (2001); Jiminez v. Rice, 276
26  F.3d 478, 482 (9th Cir. 2001). Nor is there tolling between finality of a direct appeal and the
27  filing of a federal petition. Nino, 183 F.3d at 1006-07.

28

6

1          **B.  Equitable Tolling**

2          In addition to the statutory tolling provided for by § 2244(d)(2), the "AEDPA limitations

3   period may be tolled" when it is "equitably required." Doe v. Busby, 661 F.3d 1001, 1011 (9th

4   Cir. 2011) (citations omitted). The "threshold necessary to trigger equitable tolling [under

5   AEDPA] is very high." Bills v. Clark, 628 F.3d 1092, 1097 (9th Cir. 2010) (citation and internal

6   quotation marks omitted).

7          The limitations period may be equitably tolled if a petitioner establishes "'(1) that he has

8   been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his

9   way' and prevented him from timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010)

10  (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)). An extraordinary circumstance must

11  be more than merely "'oversight, miscalculation or negligence on [the petitioner's] part.'"

12  Waldron-Ramsey v. Pacholke, 556 F.3d 1008, 1011 (9th Cir. 2009) (quoting Harris v. Carter, 515

13  F.3d 1051, 1055 (9th Cir. 2008)). Rather, petitioner must show that some "external force" "stood

14  in his way." Waldron-Ramsey, 556 F.3d at 1011. "The high threshold of extraordinary

15  circumstances is necessary lest the exceptions swallow the rule." Lakey v. Hickman, 633 F.3d

16  782 (9th Cir. 2011) (citations and internal quotation marks omitted). It is petitioner's burden to

17  demonstrate that he is entitled to equitable tolling. Espinoza-Matthews v. People of the State of

18  California, 432 F.3d 1021, 1026 (9th Cir. 2005).

19         The diligence prong in Pace requires the petitioner to show he engaged in reasonably

20  diligent efforts to file his § 2254 petition throughout the time the limitations period was running.

21  Mendoza v. Carey, 449 F.3d 1065, 1071 n.6 (9th Cir. 2006) (stating that equitable tolling

22  "requires both the presence of an extraordinary circumstance and the inmate's exercise of

23  diligence"). The petitioner must also show reasonable diligence in attempting to file his habeas

24  petition after the extraordinary circumstances and the failure to file [is] broken." Spitsyn v.

25  Moore, 345 F.3d 796, 802 (9th Cir. 2003). The "extraordinary circumstances" prong in Pace

26  requires the petitioner to "additionally show that the extraordinary circumstances were the cause

27  of his untimeliness, and that the extraordinary circumstances made it impossible to file a petition

28

7

1  on time." Ramirez v. Yates, 571 F.3d 993, 997 (9th Cir. 2009) (internal quotations and citations

2  omitted).

3      Courts are expected to "take seriously Congress's desire to accelerate the federal habeas

4  process." Calderon, 128 F.3d at 1289, overruled in part on other grounds by Calderon v. United

5  States Dist. Court (Kelly), 163 F.3d 530 (9th Cir. 1998).  See also Corjasso v. Ayers, 278 F.3d

6  874, 877 (9th Cir.2002) (describing the Ninth Circuit's standard as setting a "high hurdle" to the

7  application of equitable tolling).  To this end, "the circumstances of a case must be

8  'extraordinary' before equitable tolling can be applied[.]" Holland, 560 U.S. at 652.  Whether a

9  party is entitled to equitable tolling "turns on the facts and circumstances of a particular case."

10  Spitsyn v. Moore, 345 F.3d 796, 801 (9th Cir. 2003) (quoting Fisher v. Johnson, 174 F.3d 710,

11  713 (5th Cir. 1999)).  See also Holland, 560 U.S. at 654 (leaving "to the Court of Appeals to

12  determine whether the facts in this record entitle Holland to equitable tolling, or whether further

13  proceedings, including an evidentiary hearing, might indicate that respondent should prevail");

14  Doe, 661 F.3d at 1012 ("[W]hether a prisoner is entitled to equitable tolling under AEDPA will

15  depend on a fact specific inquiry by the habeas court which may be guided by 'decisions made in

16  other similar cases.' ") (citing Holland, 560 U.S. at 650).

17  **III.    Analysis**

18      There is no dispute that petitioner exceeded AEDPA's one-year statute of limitations for

19  filing his petition for federal habeas relief. There is also no dispute that petitioner is entitled to

20  statutory tolling during the pendency of his state habeas petitions. The only serious question

21  before the Court is whether petitioner is entitled to equitable tolling due to mental impairment.

22  The parties' respective arguments and the testimony and documents proffered at the evidentiary

23  hearing are addressed in detail below.

24      **A.  The Petition is Untimely**

25      Absent tolling, the one-year limitations period for petitioner to seek federal habeas relief

26  would have begun to run on "the date on which the judgment became final by the conclusion of

27  direct review or the expiration of the time for seeking such review."  28 U.S.C. 2244(d)(1)(A).

28  Respondent characterizes this date as November 4, 2003, reasoning as follows: On September 24,

1   2003, the California Court of Appeal for the Third Appellate District issued an opinion affirming

2   petitioner's judgment after resentencing.  Pursuant to then-effective California Rule of Court

3   28(b) (now Rule 8.500(e)(1)), petitioner had 40 days thereafter—or until November 3, 2003—to

4   seek direct review in the California Supreme Court, which he did not do.  The Court agrees with

5   respondent that, absent tolling, the one-year limitations period would have started to run on the

6   following day, or November 4, 2003.

7        The April 2014 petition filed in this court thus appears to be untimely.

8        **B.  Petitioner is Entitled to Statutory Tolling**

9           **a.   Tolling for First State Habeas Petition**

10      Respondent concedes that the commencement of the statute of limitations was

11  immediately statutorily tolled by petitioner's first petition for writ of habeas corpus filed within

12  the 40-day period between the California Court of Appeal's affirmance and the time for seeking

13  review in the California Supreme Court. "The time during which a properly filed application for

14  State post-conviction or other collateral review with respect to the pertinent judgment or claim is

15  pending shall not be counted toward any period of limitation . . . ." 28 U.S.C. § 2244(d)(2).

16  Petitioner filed his petition in the California Supreme Court on October 23, 2003.  (Lod. Doc.

17  No. 5.)  On July 28, 2004, the petition was denied.  (Lod. Doc. No. 6.)  The Court therefore finds

18  that petitioner is entitled to statutory tolling at least through July 28, 2004. The pendency of this

19  first habeas petition tolled the statute of limitations for 267 days.

20          **b.  Interval Tolling**

21      Petitioner filed a second habeas petition on November 23, 2004, with the Sacramento

22  County Superior Court. (Lod. Doc. No. 7.)  Between July 28, 2004 (from the conclusion of the

23  first state habeas petition) and November 23, 2004 (the commencement of the second state habeas

24  petition), 118 days elapsed.

25      Respondent argues that petitioner is not entitled to interval tolling for this period. He

26  contends that the filing of a habeas petition in a higher court and the subsequent filing of a habeas

27  petition in a *lower* court does not provide a basis for interval tolling. Respondent is correct on this

28  point. "The United States Supreme Court has held that applications for state post-conviction

9

1  relief . . . will be deemed 'pending' for purposes of 28 U.S.C. § 2244(d)(2), even during the

2  intervals between the denial of a petition by one court and the filing of a new petition at the *next*

3  level . . . ." Biggs v. Duncan, 339 F.3d 1045, 1046 (9th Cir. 2003) (citing Carey v. Saffold, 536

4  U.S. 214, 223–25 (2002)). In other words, "an application for post conviction relief is pending

5  during the 'intervals between a *lower* court decision and a filing of a new petition in a *higher*

6  court.'" Id. at 1048 (quoting Carey, 536 U.S. at 223 (emphasis in original)). "In the absence of

7  undue delay, the entire time [is] tolled while [the habeas petitioner] completes a full round of

8  collateral review." Id. (internal quotation from Carey omitted). Here, petitioner did not file his

9  subsequent, November 23, 2004 petition in a higher court, but in a lower court, which precludes

10  interval tolling.[3, 4]

11        In his opposition, petitioner seeks to explain the 118-day delay on the grounds that "he

12  had no knowledge that the state court had reached a final resolution of his first petition (filed on

13  10-23-03), so he filed a second petition on 11-23-04. The first petition dealt with [petitioner's]

14  original sentence, while the second petition was filed because he never heard anything back on

15  the first petition." (Opp'n, ECF No. 28 at 3.)

16         The Court is skeptical about the veracity of this claim. It appears that petitioner has at no

17  time, prior to the filing of his opposition, made mention of a failure to receive a response to his

18  October 23, 2003 petition, despite having filed numerous habeas petitions in the interim. For

19

20  [3] As the November 23, 2004 petition was filed in a lower court (the Sacramento County Superior
    Court) rather than the same court (the California Supreme Court), it also appears that petitioner

21  cannot avail himself of the exception to this rule that potentially obtains when successive
    petitions are filed in the same court: "If the successive petition was attempting to correct

22  deficiencies of a prior petition, however, then the prisoner is still making proper use of state court
    procedures, and habeas review is still pending." Banjo v. Ayers, 614 F.3d 964, 969 (2010)

23  (internal quotation omitted). Accord King v. Roe, 340 F.3d 821, 823 ("But if the petitioner
    simply attempted to correct the deficiencies, then the petitioner is still making proper use of state

24  court procedures, and his application is still 'pending' for tolling purposes."), overruled on other
    grounds by Evans v. Chavis, 546 U.S. 189 (2006).

25

26  [4] Having recognized that petitioner is not entitled to interval tolling during the period between the

27  July 28, 2004 denial of his petition by the California Supreme Court and the November 23, 2004
    filing of his petition with the Sacramento County Superior Court, the Court need not reach

28  respondent's argument that petitioner unduly delayed in filing the latter petition.

example, petitioner failed to make mention of such an omission either in the habeas petition that petitioner filed with the Sacramento County Superior Court on November 23, 2004 (Lod. Doc. No. 7), or in the two habeas petitions that petitioner has filed in this action (ECF Nos. 1, 9).

Petitioner has also failed to provide any extrinsic evidence that would tend to support his claim, or to identify, or document, any efforts that he undertook to follow up on his October 23, 2003 petition when he allegedly did not receive a response. The fact that petitioner filed the subsequent (November 23, 2004) petition in the Sacramento County Superior Court rather than in the California Supreme Court (i.e., a court at the same level) also tends to belie his claim. The Court cannot accept petitioner's belated, unsupported representation as the sole basis for tolling the statute of limitations between October 23, 2003 and November 23, 2004.

### c.  Tolling for Second Habeas Petition

Respondent concedes that the statute of limitations was then tolled again between November 23, 2004, when the second petition was filed, and January 31, 2005, when the Sacramento County Superior Court issued its denial of this petition. This tolled the statute of limitations for another 69 days.

### d.  Tolling for Other Habeas Petitions

As noted, petitioner filed two other state habeas petitions: one on April 13, 2013, with the California Supreme Court; and the second on June 1, 2013, with the Sacramento County Superior Court. Because both petitions were filed after the statute of limitations had already expired, they do not count towards tolling. See Ferguson, 321 F.3d at 823.

### e.  Expiration of Statute of Limitations

Petitioner's statute of limitations therefore began to run on November 4, 2003. Factoring in the tolling for the first and second habeas petitions, and excluding the interval between these two petitions, the Court concludes that petitioner was required to submit his federal habeas petition on or before October 5, 2005. Since petitioner did not do file his petition in this court until April 19, 2014—eight and a half years later—it again appears to be untimely.

////

////

1    **C. Petitioner is Not Entitled to Equitable Tolling**

2         The final question is whether petitioner can avail himself of equitable tolling.  "[A]

3    'petitioner' is 'entitled to equitable tolling' only where he shows '(1) that he has been pursuing

4    his rights diligently, and (2) that some extraordinary circumstance stood in his way' and

5    prevented timely filing."  Holland, 530 U.S. at 649 (quoting Pace v. DiGuglielmo, 544 U.S. 408,

6    418 (2005)).

7         **a.  The Parties' Arguments**

8         Petitioner's primary argument for equitable tolling is as follows:

9              From after the time that [petitioner] filed his second petition (11-23-
              04) up to the time he filed his third petition (4-13-13), [petitioner]
10             was too ill and unable, rationally or factually, to personally
              understand the need to timely file, or seek out anyone else's help, to
11             effectuate its filing.

12             [Petitioner's] delusions made him incapable of rationally
              understanding the necessity of filing a timely habeas petition because
13             before the delusions lifted, nothing anyone might say to him about
              the need to timely file would have altered his behavior.
14

15    (Opp'n, ECF No. 28 at 4-5) (internal citations omitted).  Petitioner elaborates on this argument in

16    his first amended petition.

17         Respondent argues that equitable tolling is unwarranted, writing:

18             Respondent has obtained a copy of Petitioner's complete mental
              health record.  Respondent submits these mental health records as
19             Exhibit A.   Petitioner's mental health records during his entire
              incarceration, especially during the relevant time frame, do not
20             reflect a mental disorder of a severity that would prevent him from
              understanding the need to file a timely federal petition and from
21             enlisting the proper assistance . . . .  The documents reveal that while
              Petitioner was included in the mental health treatment program, he
22             participated as an outpatient in the Correctional Clinical Case
              Management System (CCCMS) level of care and was usually housed
23             in the general prison population until 2008.  […]  It appears from the
              record that Petitioner required a higher level of care in 2008 and was
24             transferred to the EOP (Enhanced Outpatient Program) level.  This
              occurred years after the limitations period expired and is therefore
25             inconsequential.  Moreover, Petitioner is noted as having a global
              assessment of functioning (GAF) score ranging from the mid-50s to
26             70 during the relevant time frame, which suggests only a mild to
              moderate impairment.
27

28

12

1    (Motion, ECF No. 22 at 8-9) (internal citations omitted).  Respondent goes on to cite numerous

2    instances in petitioner's medical record when petitioner was identified as being stable while on

3    medications. Id. at 9-10. Respondent also cites instances in the record describing petitioner as

4    non-compliant in taking medications and experiencing consequent deterioration in his mental

5    health; respondent argues that tolling is unwarranted under such circumstances. Id.

6                          **b.  Overview of CDCR's Mental Health Care**

7              Within CDCR, there are two outpatient levels of care and three in-patient levels of care.

8    Evid. Hr'g Tr. 11:20-22. These levels of care are outlined in the CDCR's Mental Health Services

9    Delivery System ("MHSDS"), and all new mental health staff are trained on the CDCR practices

10   outlined in the MHSDS. Evid. Hr'g Tr. 13:10-11. Inmates with a mental illness are placed in one

11   of these five levels of care based upon the mental health screening they receive at a reception

12   center when they first enter CDCR custody. Id. 13:13-24. The Court will focus on the two

13   outpatient levels of care since only they are relevant to an analysis of petitioner's claim.

14                     **i.  Correctional Clinical Case Management System (CCCMS)**

15             Of the levels of care addressed in the MHSDS, the Correctional Clinical Case

16   Management System ("CCCMS") is the lowest level of mental health care that a prisoner can

17   receive. Evid. Hr'g Tr. 11:22-25. The specific criteria for entry in the CCCMS program is (1)

18   stable functioning in the general population, administrative segregation unit, or security housing

19   unit; (2) criteria not met for higher levels of care; (3) exhibits symptom control or is in partial

20   remission as a result of treatment; and (4) a Global Assessment of Functioning Scale ("GAF")[5]

21   score of 50 and above. Evid. Hr'g Tr. Ex. 2 at 12-3-5.

22             A threshold criteria for inmates receiving CCCMS level of care is whether they are

23   experiencing current symptoms and/or require treatment for the current Diagnostic and Statistical

24   Manual diagnosed Axis I serious mental disorders, such as schizophrenia (all subtypes),

25   delusional disorder, schizoaffective disorder, and psychotic disorder not otherwise specified.

26   Evid. Hr'g Tr. Ex. 2, 15:4-7. If an inmate does not have the aforementioned criteria or a recent

27

28   [5] The GAF scores will be discussed in detail infra.

                                                 13

1    episode of exhibitionism or a "medical necessity" (defined as the need for immediate mental

2    health intervention to protect life and/or treat significant disability/dysfunction), then that inmate

3    does not qualify for mental health care in the CDCR. Evid. Hr'g Tr. Ex. 2, 15:25—16:3.

4           Inmates in the CCCMS program are housed in general population, receive psychiatric

5    services and individual follow-up by their primary clinician, have a treatment team, and

6    sometimes receive group therapy. Evid. Hr'g Tr. 11:25—12:8. In terms of functioning, they are

7    expected to be able to function within the general population and access other programs and

8    services available to non-mentally ill inmates. Id.

9           The institutional goal for the CCCMS outpatient program is to provide mental health

10   treatment to inmates who are able to function well within the general population and whose

11   symptoms are mostly controlled, if not in remission, and who can go to work, school, and

12   participate in activities that non-mentally ill inmates participate in. Evid. Hr'g Tr. 17:4-11.

13                          **ii.   Enhanced Outpatient Program (EOP)**

14          The second most intensive level of mental health care offered at CDCR is the Enhanced

15   Outpatient Program ("EOP"). See Evid. Hr'g Tr. Ex. 3. This program, which is also outpatient, is

16   characterized by a separate housing unit and structured activities for mentally ill inmates who,

17   because of their illness, experience adjustment difficulties in a general population setting yet are

18   not so impaired as to require 24-hour inpatient care. Id. The designated housing unit for EOP

19   inmates has restricted access and alternative educational, work, and recreational opportunities. Id.

20          As with the CCCMS level of care, the overall treatment criteria for the EOP level of care

21   is treatment and monitoring for current symptoms and/or treatment for the current and/or requires

22   treatment for the current Diagnostic and Statistical Manual diagnosed Axis I serous mental

23   disorders. Evid. Hr'g Tr. Ex. 3 at 12-4-2. As with CCCMS, it also includes medical necessity and

24   exhibitionism. See id. 12-4-3. The specific treatment criteria include acute onset or significant

25   decompensation of a serious mental disorder characterized by symptoms such as increased

26   delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs

27   with definitive impairment of reality testing and/or judgments. Id. There may alternatively be an

28   inability to function in general population based upon a demonstrated inability to program in

1   work or educational assignments or other correctional activities; the presence of dysfunctional or

2   disruptive social interaction including withdrawal, bizarre or disruptive behavior, extreme

3   argumentativeness, or inability to respond to staff direction; or an impairment in the activities of

4   daily living including eating, grooming and personal hygiene, maintenance of housing area, and

5   ambulation. Id. Additionally, the GAF score must be less than 50. Id.

6          The institutional goal for the EOP inmates is to (1) provide short to intermediate term care

7   (3-12 months for most cases) for inmates who do not require 24-hour inpatient care; (2) provide

8   longer-term placement for inmate-patients with chronic mental illness whose symptoms have

9   stabilized but whose level of functioning is insufficient to allow placement in General Population;

10  and (3) to provide short-term secure custodial placements with clinical resources which address

11  behavioral problems for mentally ill EOP inmates who are transitioning from Security Housing

12  Units or Psychiatric Services Units. Evid. Hr'g Tr. Ex. 3 at 12-4-1 to 12-4-2.

13                      **c.   GAF Scores**

14         The MHSDS provides basic guidelines for the role that GAF scores play in determining

15  the appropriate level of care for inmates. Evid. Hr'g Tr. Ex. 1, 16:8-12. The GAF score is a

16  measure that was developed for clinicians to provide a judgment about their client's level of

17  symptom severity and level of functioning on a scale of 1-100. Evid. Hr'g Tr. 22:22-25. It is

18  broken down into 10-point ranges from 1-100, and each 10-point range has a description of the

19  symptoms and functioning for that range. Id. 22:25—23:3; see also id. Ex. 1. As noted, inmates in

20  the CCCMS program are expected to have a GAF score of 50 or above. Evid. Hr'g Tr. Ex. 2 at

21  12-3-5. EOP inmates are expected to have a GAF score of less than 50. Id. Ex. 3 at 12-4-4.

22         GAF scores were not created with the prison population in mind. Evid. Hr'g Tr.  85:25—

23  86:2. But they were adapted by CDCR to indicate an inmate's level of functioning within the

24  prison setting. Id. 86:4-10. A GAF score is typically assigned by the primary clinician, the social

25  worker, or the psychologist on the inmate's treatment team. Id. 26:15-18. On a given day, the

26  clinician would evaluate the inmate by considering their symptoms and how they are functioning

27  that day. Id. at 23:14-22. They would then compare those symptoms to the 10-point ranges on the

28  GAF scale and assign a number on the lower end of a range if they think the symptoms are more

1    severe or on the higher end of the scale if they think the symptoms are less severe. Id. 23:23—

2    24:1. When an inmate has, for example, symptoms that are more severe than their functioning

3    seems to be, then, per DMS standards of construction, the clinician would assign a GAF score

4    that reflects the worse of the two. Id. 24:3-6; 88:24—89:3. Notwithstanding the DMS standard of

5    construction, a clinician may also assign a GAF score that is an amalgamation of the functioning

6    v. symptoms scores (e.g., an average of the two numbers). See id. 90:21—91:16. Sometimes, a

7    clinician may assign a GAF score based on the level of care that the clinician thinks an inmate

8    need. Id. 87:10-24.  Since the GAF score could trigger a higher or lower level of care and, thus,

9    affect the inmate's inter- and intra-institution movement (e.g., transfer to an institution to provide

10   a higher level of care), the mental health professionals who were assigning these scores in this

11   way were cognizant of the effect of the chosen GAF score. Id. 25:13-20.

12          A single GAF score that appears inconsistent with an inmate's level of care would not

13   raise a concern. See Evid. Hr'g Tr. 27:7-12. But if a CCCMS inmate received a GAF score of 45

14   over a period of weeks or a month, then the clinician would inquire further because of the

15   significant of the GAF scores in assigning program status in CDCR. Id. 27:11-17.

16          As delineated in the "Global Assessment of Functioning (GAF) Scale," the symptoms and

17   functionality for three levels of GAF scores that are relevant to the Court's analysis are

18   reproduced here:

19                  [GAF Scores Between 61-70] **Some mild symptoms** (e.g., depressed
                    mood and mild insomnia) **OR some difficulty in social,**
20                  **occupational, or school functioning** (e.g., occasional truancy, or
                    theft within the household), **but generally functioning pretty well,**
21                  **has some meaningful interpersonal relationships**

22                  [GAF Scores Between 51-60] **Moderation symptoms** (e.g., flat
                    affect and circumstantial speech, occasional panic attacks) **OR**
23                  **moderate difficulty in social, occupational, or school functioning**
                    (e.g., few friends, conflicts with peers or co-workers)
24
                    [GAF Scores Between 41-50] **Serious symptoms** (e.g., suicidal
25                  ideation, severe obsessional rituals, frequent shoplifting) **OR any**
                    **serious impairment in social, occupational, or school functioning**
26                  (e.g., no friends, unable to keep a job)

27   Evid. Hr'g Ex. 1.

28

1    The Diagnostic and Statistical Manual, Fifth Edition, was published in 2013, and it

2    removed the GAF scores entirely. Evid. Hr'g Tr. 27:24—28:3. In Dr. Deserie Barragan's expert

3    opinion, the GAF score was removed because it lacked "conceptual clarity with respect to the

4    symptoms and functioning levels…." Id. 28:6-14. She testified that it also lacked reliability,

5    meaning it didn't always measure what it said it measured. Id.

6                            **d.  Petitioner's Mental Health Records**

7    With this overview of CDCR's mental health care system, the Court now turns to

8    petitioner's mental health records. In particular, the Court will focus on four distinct periods of

9    time: (1) first, when petitioner entered CDCR until he exhausted his direct appeal (May 2001 to

10   November 2003); (2) second, when the statute of limitations was statutory tolled while petitioner

11   pursued his state habeas petitions (October 2003 to January 2005); (3) third, when, absent

12   equitable tolling, petitioner was required to submit his habeas petition (the interval between the

13   first and second habeas petitions, and then between February 2005 and October 2005); and, lastly,

14   (4) immediately following the expiration of the statute of limitations through petitioner's

15   placement in the EOP level of care (October 2005 to June 2008).

16                        **i.  Mental Health During Pendency of Direct Appeal**

17   During the first period between May 22, 2001—when petitioner was found guilty of five

18   counts of first-degree robbery—to November 4, 2003—when the limitations period began to run

19   absent any tolling, petitioner was actively pursuing his direct appeal in the California courts.

20   Petitioner entered CDCR custody on or around September 5, 2001, at Deuel Vocational

21   Institute ("DVI"). See ECF No. 32-1 at 3. At intake, he completed an "Educational Test" and was

22   found to have "high cognitive test scores and did not require adaptive functioning evaluation." Id.

23   His mental health screening, however, revealed the need for further evaluation because petitioner

24   self-reported that he was paranoid schizophrenic and had attempted suicide in the past. Id. 6-7.

25   During a subsequent mental health evaluation, petitioner repeated this information and claimed to

26   have audio and visual hallucinations. Id. 9-11. The examining clinician noted that petitioner had

27   no issues with perception (e.g., hallucinations) or thought content (e.g., delusions, preoccupation)

28

17

1  when he was on Prolixin[6]. Id. Petitioner received a GAF score of 65. Id. On or around the same

2  date, petitioner was assigned a second GAF score of 50 by another clinician, who noted that

3  petitioner had been hearing voices from an early age. See id. 12-14. Both clinicians recommended

4  the CCCMS level of care. Id. 11, 15.

5      Petitioner was housed at DVI until his transfer to High Desert State Prison ("HDSP") on

6  or around November 2001. See ECF No. 32-1 at 16. At HDSP, his intake GAF score was 55. Id.

7  16-17. He was noted to have "poor judgment + decision making," and he "present[ed] [with] slow

8  process + poor cognition." Id. His recurring "delusions of believing he is God + that he can make

9  things happen to people by his thoughts" were also noted. Id. 19. His treatment plan, dated

10 November 7, 2001, shows "slow" intellectual functions, "poor" organization of thought,

11 "impaired" reality contact, and thought quality that was "delusional at times." Id. 27. His

12 hallucinations were present, telling him that "he has special powers / or laugh at him." Id.

13      In 2002, petitioner's GAF scores ranged from 50-68. See generally ECF No. 32-1 at 31-

14 46. In February, he was "speak[ing] coherently about incarceration" with "no gross evidence of

15 psychotic or disorganized thinking," id. 34; by April, he was not sleeping well, the voices were

16 teasing him, "trying to humiliate me or something," and he admitted that he was yelling at the

17 voices, id. 35; in May, he continued "to have well-developed religious ideation that becomes part

18 of his delusions process," id. 36; in October, the auditory hallucinations continued, as did his

19 paranoia, racing thoughts, perpetual disturbance and distortions, id. 43; but by December, he

20 seemed "pretty happy" and "well-oriented," with the majority of his behaviors (sleep, speech,

21 mood, presenting attitude) considered "within normal limits," though he was described as

22 "hypomanic," id. 46.

23      In 2003, petitioner's condition became slightly more symptomatic with GAF scores

24 ranging from 54-65. See generally ECF No. 32-1 at 49-68. In January, petitioner stated that he

25 had been hearing voices since he was 5 years old. Id. 50. When he is off his medication, the

26 voices are "demeaning," telling him to hurt himself or others. Id. 49. In February, he was noted to

27

28  ---
   [6] Prolixin is an antipsychotic medication. Evid. Hr'g Tr. 43:2-3.

1    talk to and argue with his "voices" daily, id. 52, and his hallucinations were "command[ing]" him

2    to hurt himself and others, id. 53-56. In May, petitioner claimed his medication "isn't working

3    like it used to" and that the "[government] is after [him]"; petitioner was described as "paranoid"

4    with "grandiose ideation." Id. 60. In June, petitioner continued "having auditory hallucinations

5    although they essentially keep him company and occupy him." Id. 61. In September, petitioner

6    was alert, cheerful, and communicative; he was actively pursuing his legal issues and

7    communicated "often" with his attorney. Id. 63.

8                          **ii.   Mental Health During Pendency of State Habeas Petitions**

9            Immediately following the conclusion of his direct appeal, petitioner pursued two state

10   habeas petitions: the first was filed on October 23, 2003, and denied on July 28, 2004, and the

11   second was filed on November 23, 2004, and denied on January 31, 2005. During this period,

12   petitioner's mental health records continued to reveal auditory hallucinations and symptoms of

13   paranoid schizophrenia.

14           In mid-December 2003, petitioner "still ha[d] auditory hallucinations but they are not

15   bothering him that much at present time." ECF No. 32-1 at 66. Just two weeks later, he was

16   placed in a holding cell because he was found "yelling and screaming" in his own cell, he

17   "couldn't sit still or sleep," and he had "[visuals] of faces, words" "all the time." Id. 68. His GAF

18   score on this day was 61. Id.

19           In 2004, petitioner's GAF scores ranged between 55 and 65. See generally ECF No. 32-1

20   at 69—ECF No. 32-2 at 2. In March, members of his Interdisciplinary Treatment Team decided

21   to retain him in CCCMS even though he had "command" auditory hallucinations that directed

22   him "to hurt self &/or others." ECF No. 32-1 at 69-74. Later that same month, the "voices" were

23   telling petitioner that he was God; on that same date, he received a GAF score of 63. Id. 75. In

24   June, he was found to be "jovial," "happy," and "stable," even though he was also found to be

25   "dissociative unstable." Id. 77. In August and September, he was programming positively with no

26   complaints and with medication compliance. See id. 81-82.

27           On or around August 2004, petitioner was transferred to Folsom State Prison ("FSP"). See

28   ECF No. 32-1 at 84-88. There, he continued to report auditory hallucinations and delusions. Id.

                                                       19

1   Notes from October from his Interdisciplinary Treatment Team reflect that, while the delusions

2   and hallucinations continued, CCCMS continued to be the appropriate level of care for him. Id. at

3   89-91. In early-December, petitioner's symptoms were "in remission," and in late-December,

4   with a GAF score of 55, he "[reported] that he is feeling better [because] a friend of his has

5   finished a writ for him about reducing his sentence and he is hopeful re the outcome." ECF No.

6   32-2 at 1-2.  In this same report, petitioner was described as having "both paranoid and grandiose

7   delusions about 'being special' and being sent to prison by his voices to keep him safe until he

8   can take over the world. He also believes that his mother and other relatives are conspiring

9   against him and withholding his inheritance that he received from his great grandfather. He

10  believes that his mother is able to see through his eyes and one of the voices he hears is hers." Id.

11       Petitioner's mental health records during his pursuit of his state habeas petitions concludes

12  with medical notes from January 2005. See ECF No. 32-3 at 3-5. On January 6, petitioner was

13  deemed to be "improving" with "less rambling and tangential" speech than the prior session. On

14  January 28, petitioner was found to be "stable" even though he requested "to see Dr. Staples (who

15  does not exist)." Id. 5. Petitioner's final GAF score during this period was 65. Id.

16                    **iii.  Mental Health During Limitations Period**

17       As discussed above, the statute of limitations began to run after petitioner's first state

18  habeas petition was denied and then tolled again during the pendency of the second state habeas

19  petition. Factoring in that interval and excluding the pendency of the state habeas petitions,

20  petitioner was required to submit his federal habeas petition on or before October 5, 2005. The

21  Court thus now turns to the third period of petitioner's mental health records, focusing on those

22  dated through October 5, 2005, when the statute of limitations expired.

23       On February 1, 2005, petitioner underwent a suicide risk assessment because he had said

24  that he wanted to "end it all" while in his cell. ECF No. 32-2 at 6. In April 2005, petitioner, who

25  was assigned a GAF score of 55, complained about issues with his cellmate and claimed that his

26  statement to "end it all" referred to his housing issues. Id. 7-8. His medical notes indicate that he

27  was having "some definite signs of delusion and paranoia," but his "judgment and insight are

28

1   good." Id. On April 13, he was found to be "organized and goal directed" with some signs of

2   delusions and auditory hallucinations; he was assigned a GAF score of 70. Id. 10.

3          In July 2005, petitioner continued to report auditory and visual hallucinations and to

4   exhibit paranoia. ECF No. 32-2 at 15. His GAF scores that month were in the mid- to upper-60s,

5   he was deemed "stable with med compliance," there were "no signs of internal preoccupation,"

6   and his thought process was noted to be "clear and rational." Id. 15-16. In September, he was

7   "doing well" even though his thought process was "flight"[7] and his thought content included

8   "delusions"; his assigned GAF score was 70. Id. 17. Finally, on October 3—two days before the

9   statute of limitations expired—he "appear[ed] stable with med," he was eating and sleeping well,

10  he reported no depression or anxiety, he was "not as paranoid," and he was "doing well with cell

11  mate." Id. 20.

12                   **iv.   Mental Health After the Statute of Limitations Expired and Before**

13                           **Petitioner's Placement in EOP**

14         Finally, the Court considers the period following the expiration of the statute of

15  limitations in October 2005 through petitioner's transfer to the EOP level of care in June 2008.

16         On October 18, 2005, petitioner's Interdisciplinary Treatment Team assigned petitioner a

17  GAF score of 64. ECF No. 32-2 at 21-23. Petitioner was doing well on medication, he was taking

18  care of his activities of daily living, he was found to be alert and smiling, and his cognition was

19  deemed within normal limits. Id. He did, however, have "poor reality testing," and his insight,

20  judgment, and concentration were "poor." Id. Nonetheless, he was deemed "stable," and the team

21  retained him in CCCMS. Id. In December 2005, his GAF was again a 64. Id. 27.

22         Petitioner began 2006 with a GAF of 66 and reports of "doing wonderful on present

23  medications – no issues today – doing great for the past 90 days." ECF No. 32-2 at 28. His

24  thought process and thought content were within normal limits, he was cooperative, he had

25  appropriate affect, and he was oriented as to people, place, and time. Id.

26

27  ─────────────────

28  [7] "Flight" is a term use to describe very disorganized thinking, where an individual's train of
    thought is hard to follow. See Evid. Hr'g Tr. 48:5-8.

1      Around this time, petitioner's non-compliance with his psychiatric medications began to

2  be noted. ECF No. 32-2 at 29 ("Patient states he hasn't been taking his 4 meds for 3 weeks +

3  doing good. Hears voices but states he's able to deal with them. States he's starting to work out

4  again.") On March 1, petitioner indicated that he was "feeling good off 4 meds, feels 'at ease.'

5  Continues to hear voices but states he's able to deal [with] them." Id. 30. On March 29, he was

6  assigned a GAF of 65 after he was found to be "alert, oriented. Rational. Clean. No delusions

7  exhibited. … No distress. Relates well." Id.

8      On May 10, petitioner reported increased auditory hallucinations. ECF No. 32-2 at 31. He

9  stated that he "feels he's responding too much to them." Id. The clinician wrote that petitioner

10  "seems genuinely mentally ill. Some delusions noted," and assigned a GAF score of 58. Id. On

11  May 17, petitioner stated that he was having "loud conversations [with] his voices + states his

12  voices are getting out of hand." Id. 32. His mood was "a little rough," and a 4-week follow-up

13  was ordered. Id.

14      On June 14, petitioner's "mental stability [was] better" after restoring his medication. ECF

15  No. 32-2 at 33. On June 29, the "voices [were] less severe + now 'in-check.'" Id. Petitioner said

16  that "he keeps his thoughts to himself…goes to library a lot." Id.

17      On August 9, petitioner indicated that he was "doing 'alright'" with occasional auditory

18  hallucinations. ECF No. 32-2 at 34. The following month, he was deemed "stable in all critical

19  areas," managing symptoms "very well at present," had normal thought processes, and was

20  assigned a GAF score of 65. Id. 35. On October 4, he was again found to be "stable in all critical

21  areas" with "no current issues," normal thought processes, and "no overt psychotic thinking." Id.

22  36. Once again, his GAF score was 65. Id. A medical note did, however, indicate that petitioner

23  was non-compliant with his medications due to Ramadan. Id. 37.

24      On October 17, the Interdisciplinary Treatment Team assigned petitioner a GAF score of

25  65. ECF No. 32-2 at 39-42. They noted that petitioner was taking care of his activities of daily

26  living, and he had "adequate [cognitive] skills" and "intact" cognition (to include intellectual

27  functions, organization of thought, association of thought, reality contact, and thought quality).

28  Id.

22

1    On November 1, petitioner sought to restart his medications since Ramadan was then

2    over. ECF No. 32-2 at 43. Despite his professed interest in restarting his medication, however, a

3    medical note dated November 24 revealed that petitioner failed to show for evening medication

4    line for four consecutive days. See id. 44. On December 7, he failed to show to evening

5    medication line for seven days. Id. 46. On December 13, petitioner was assigned a GAF score of

6    65 after reporting "feeling stable in all areas." Id. 47.

7    In 2007, petitioner's symptoms became more marked. By March 2, he had not been taking

8    his psych meds for 2-3 months. See ECF No. 32-2 at 49. While he was deemed "stable in all

9    critical areas," the clinician noted an increase in psychotic signs and symptoms. Id. His thought

10   process was "tangential," and his thought content included "delusions." Id. His GAF score was

11   62. Id. On March 5, it was determined that petitioner did not meet the Keyhea criteria for forced

12   administration of psychiatric medication.[8] Id. 50. On March 29, petitioner was assigned a GAF

13   score of 55. ECF No. 32-2 at 51. At that time, his thought disorder had increased, his thought

14   processes were "circumstantial," and his thought content was delusional. Id. He self-referred to

15   the clinician on that date, requesting psych meds because he now felt "ready." Id. He also stated

16   that he wanted a job, and the clinician referred him to a correctional counselor. Id.

17   For the remainder of 2007, petitioner's GAF scores were 60, and he continued to be

18   inconsistently compliant with his medication. See ECF No. 32-2 at 52-59, 63-65, 67. For

19   example, during a period when he repeatedly missed the medication line, his thoughts were

20   "tangential" and "disordered," and he provided his clinician with a "long rambling letter" to then-

21   Governor Schwarzenegger to release him and give him a "mayorship." Id. 58. When he was on

22   medication, however, he felt well with decreased hallucinations and symptoms. Id. 64-66. On

23   December 7, petitioner was noted to be functioning at FSP well ("gets along well with his new

24

25   ─────────────
     [8] When an inmate refuses to take his medication, a psychiatrist can seek a court order for the
26   administration of involuntary medication. Evid. Hr'g Tr. 28:23—29:15. This used to be called a
     "Keyhea Order," but is now referred to as Penal Code 2602. Id. The threshold criteria for this
27   order is that the patient is in a crisis bed or an in-patient setting and (a) their symptoms are so
     severe that they present as a danger to themselves or others due to a severe mental disorder or (b)
28   they're so gravely disabled that they cannot take care of themselves. Id.

1  cellie, doesn't get write-ups, etc.), but his symptoms were reappearing "based on the fact that he

2  made paranoid and tangential statements." Id. 67.

3        In January 2008, petitioner wanted to quit his medication entirely. See ECF No. 32-2 at

4  68. He then asked to restart them in February, though his subsequent level of compliance was

5  unclear. See id. 68-69. His GAF score was 60 on that visit. Id. On March 18, petitioner again

6  received a GAF score of 60, was getting along well with his cell mate, and was compliant with

7  his medication. Id. 70. By April 25, petitioner had been taking his medication only once a week,

8  and his speech was described as "somewhat loose but makes some good points." Id. 71.

9        On May 23, petitioner's paranoia and symptoms increased to the point of concern. See

10  ECF No. 32-2 at 71. Petitioner claimed he was not taking his medications because "someone

11  might put poison in them." Id. His auditory hallucinations were still present, and he had "mildly

12  loose speech (worse when not answering structured questions)." Id. After expressing concern

13  about petitioner's condition, the clinician wrote, "I do not think this [patient] will get better in

14  [Folsom State Prison]." Id. Petitioner was assigned a GAF score of 48 and referred to the EOP

15  level of care. See id. 72-78. On June 3 and June 10, he was again assigned a GAF of 48. Id. 79-

16  80. On June 16, petitioner admitted to not taking his medications for 4-5 months "for fear of

17  poisoning." Id. 81. On June 17, he was assigned a GAF of 45. Id. 82.

18        Petitioner was transferred to California Medical Facility ("CMF") on June 27, 2008, to

19  participate in the EOP level of care. See ECF No. 32-2 at 86. There, he was examined by a

20  clinician who assigned a GAF score of 40. Id. 75. During the evaluation, it was noted that

21  petitioner had been "pacing, yelling, challenging his cell mate to fight, standing over him at night

22  while staring and gritting his teeth. He also had a sharpened toothbrush." Id. 87. Petitioner also

23  "thought people are plotting against him but could not explain. [Patient] experiences thought

24  broadcasting but denies special powers. Although he says he wrote the Governor to get a job with

25  the state, he has adequate problem solving skills for routine activities." Id. 89.

26        On August 7, the examining clinician wrote that "[t]here was evidence of psychosis." ECF

27  No. 32-2 at 100. Petitioner's "[t]houghts were disorganized, often speaking in word salad, using

28  words together in nonsensical sentences, mostly with paranoid themes." Id. On October 6, he was

1  observed talking to a wall on his way to breakfast. Id. 32-3 at 10. On October 7, he was seen by

2  his Interdisciplinary Treatment Team, who decided to continue petitioner in the EOP level of care

3  due to his "continued disorganization, intermittent paranoia, delusions, and difficulty

4  programming." Id. 12. During the remainder of 2008, petitioner continued to have issues with

5  medication compliance. See id. 10, 13, 17, 19, 21, 25, 27.

6              **e.  Petitioner's Expert Witness**

7                    **i.  Dr. Barragan's Experience**

8              At the November 12, 2019, evidentiary hearing, Dr. Barragan testified as petitioner's

9  expert witness. Dr. Barragan works as a consulting psychologist for the California Department of

10  State Hospitals and has extensive experience reviewing mental health records and assessing the

11  needs of mentally ill inmates. Evid. Hr'g Tr. 6:1-3. In her present role, she travels to different

12  correctional institutions mostly to evaluate mentally ill prisoners for severe mental disorders and

13  violence risk or sex offender risk. Id. 6:3-7. Previously, she worked as a staff psychologist at the

14  California Institution for Men ("CIM") where she conducted initial screening and evaluations of

15  inmates arriving at the institution's reception center. Id. 6:11-19. For the inmates who tested

16  positive for cognitive and developmental disabilities, Dr. Barragan completed further evaluations,

17  provided diagnoses, and decided what level of mental health care the inmates should receive

18  within the prison system. Id. 6:18-25.

19              Dr. Barragan then became involved in developing programs and providing treatment to

20  the severely mentally ill inmates at CIM while they awaited transfer to other institutions. Evid.

21  Hr'g Tr. 7:4-20. Dr. Barragan's new role followed a consent decree entered in the class action,

22  Coleman v. Schwarzenegger, Case No. 90-cv-0520-LKK-JFM (E.D. Cal.). Id.

23              In 2004, Dr. Barragan helped lead a team of psychiatrists and psychologists working on

24  the "Unidentified Needs Assessment Project," which was tasked by the Coleman Special Master

25  with finding out how many severely mentally ill prisoners were in CDCR who needed a higher

26  level of care at the Department of State Hospitals. Evid. Hr'g Tr. 8:5-21. In pursuit of that goal,

27  Dr. Barragan and members of the team traveled to all CDCR institutions that housed mentally ill

28  inmates. Id. Their work involved reviewing medical records and interviewing inmates. Id.

Dr. Barragan has since worked at several CDCR institutions in supervisory roles where she reviewed charts to ensure compliance with the Coleman court mandates, supervised the mental health programs at California Men's Colony, and served as the clinical director of the mental health crisis bed at CIM for approximately four years. See Evid. Hr'g Tr. 8:24—10:4.

Dr. Barragan has never met petitioner. Evid. Hr'g Tr. 30:13-14.

**ii.   Testimony Regarding Petitioner's Mental Health Records**

At the hearing, Dr. Barragan identified several records that she believed included a GAF score that did not accurately reflect petitioner's listed symptoms. While Dr. Barragan's testimony spanned much of petitioner's mental health records (from 2001 through 2011), the Court will address only those that are included within the timeframes of one of the four periods identified supra.

Dr. Barragan first identified a November 7, 2001, Mental Health Treatment Plan that showed "slow" intellectual functioning, "poor" organization of thought, "impaired" reality contact, and thought quality that was "delusional at times." ECF No. 32-1 at 27. Petitioner had stated that he hears voices that either laugh at him or tell him he has special powers. He also believed that he was God. Based on these symptoms, the examining clinician assigned a GAF score of 55. Id. 26. Dr. Barragan disagreed with this assessment, noting that the symptoms described appear to be more severe than a GAF score of 55 would suggest. See Evid. Hr'g Tr. 39:7-18. In her opinion, the GAF should have been in the range of 31-40. Id.

In an Interdisciplinary dated May 3, 2002, petitioner was noted to have "well developed religious ideation that becomes part of his delusional process." ECF No. 32-1 at 36. His GAF score on that date was 55. Dr. Barragan testified that the score should have been "closer to 40" because of evidence of impaired reality contact. Evid. Hr'g Tr. 43:22—44:15.

In an Interdisciplinary Progress Note dated May 1, 2003, petitioner was noted to be hearing voices of his "family + others" apparently telling him that he was going to "get[] out soon." ECF No. 32-1 at 60. Petitioner also said, "I will sit on 3rd throne," and he was deemed paranoid with grandiose ideation, stating that the "[government] is after me." Petitioner was

1  assigned a GAF score of 56, but Dr. Barragan believed the symptoms align more accurately with

2  a score between 31-40. Evid. Hr'g Tr. 42:18—43:9.

3      In an Interdisciplinary Progress Note dated December 31, 2003, petitioner was seen on an

4  emergency basis after a sergeant requested a review because petitioner was found yelling and

5  screaming in his cell. ECF No. 32-1 at 68. The medical note included a notation of "[visuals] of

6  faces, words," "all the time." The clinician assigned a GAF score of 61, but Dr. Barragan thought

7  a GAF score "closer to zero" should have been assigned because "his behavior was significantly

8  influenced by delusions or hallucinations." Evid. Hr'g Tr. 40:11—41:13.

9      In an Interdisciplinary Progress Note dated December 23, 2004, petitioner reported

10  "feeling better [because] a friend of his has finished a writ for him about reducing his sentence

11  and he is hopeful re the outcome." ECF No. 32-2 at 2. Additionally, he was noted to have "both

12  paranoid and grandiose delusions about 'being special,' and he believed that "his mother and

13  other relatives [were] conspiring against him and withholding his inheritance …." He also

14  claimed that his mother was able "to see through his eyes and one of the voices he hears is hers."

15  Id. Based on these symptoms, the assigned GAF score was 55. Dr. Barragan testified that the

16  symptoms better correspond with a GAF score of 38 or 40. Evid. Hr'g Tr. 45:15—46:18.

17      In an Interdisciplinary Progress Note dated September 21, 2005, petitioner said he was

18  "doing well," but his thought process was described as "flight" and he had delusional thought

19  content. ECF 32-2 at 17. Despite these symptoms, his assigned GAF score was 70. Dr. Barragan

20  testified that the GAF score should have been 40 because petitioner was having difficulty

21  communicating due to disorganized thoughts and delusions. Evid. Hr'g Tr. 48:10-18.

22      In an Interdisciplinary Progress Note dated March 2, 2007, petitioner was deemed "stable

23  in all critical areas," but the clinician noted increased psychotic signs and symptoms even though

24  petitioner was found to be managing the behaviors. ECF No. 32-2 at 49. Petitioner's thought

25  process was described as "tangential," and his thought control was described as "delusional." His

26  GAF score on that day was 62. Dr. Barragan believed that a GAF score closer to 38 better

27  reflected his impaired reality testing and impaired communication. Evid. Hr'g Tr. 48:25—49:15.

28

1      In an Interdisciplinary Progress Note dated March 29, 2007, petitioner self-referred

2  himself so that he could restart his psych meds. ECF No. 32-2 at 51. His thought process was

3  noted to be circumstantial, his thought content was delusional, and the clinician noted his thought

4  disorder had increased. He was assigned a GAF score of 55. Dr. Barragan testified, based on

5  these symptoms, his GAF should have been between 31 to 40. Evid. Hr'g Tr. 51:19—52:15.

6      In an Interdisciplinary Progress Note dated May 18, 2007, petitioner's GAF score was 60.

7  ECF No. 32-2 at 53. The notes indicate that petitioner's delusions had been increasing again, his

8  thought processes were tangential, and his thought content was delusional. Dr. Barragan testified

9  that a GAF of 35 or 38 would have been more appropriate. Evid. Hr'g Tr. 52:17-23.

10     In an Interdisciplinary Progress Note dated June 15, 2007, petitioner was again assigned a

11  GAF score of 60. ECF No. 32-2 at 54. At this point, he continued to be delusional with loose

12  thought processes. Dr. Barragan believed that the GAF should have been 38 or 39. Evid. Hr'g Tr.

13  53:21—54:15.

14     In an Interdisciplinary Progress Note dated June 28, 2007, petitioner's GAF score was still

15  60 despite having difficulty managing psychotic signs and symptoms and having delusional

16  thinking. ECF No. 32-2 at 56. Dr. Barragan opined that the GAF score should have been 38. Evid.

17  Hr'g Tr. 56:11-21.

18     In an Interdisciplinary Progress Note dated December 7, 2007, petitioner's GAF score

19  continued to be 60 even though he had "tangential" and "loose thought processes," paranoia, and

20  reappearing symptoms. ECF No. 32-2 at 67. Dr. Barragan testified that the GAF score should

21  have been 38. Evid. Hr'g Tr. 60:13-23.

22     In a Mental Health Treatment Plan dated July 1, 2008, after petitioner was transferred to

23  participate in the EOP program at CMF, he was assigned a GAF score of 40. ECF No. 32-2 at 97-

24  99. His symptoms at the time include "paranoid ideation, disorganized thought process, chronic

25  [auditory hallucinations], thought broadcasting, grandiose and paranoid delusions, and rapid

26  speech." Id. 99. Dr. Barragan believed the GAF score should have been closer to 30. Evid. Hr'g

27  Tr. 61:5-25.

28

1   Dr. Barragan also identified several records that purportedly included high GAF scores,

2   but she did not provide an alternate GAF score due to lack of information in the medical notes.

3   See Evid. Hr'g Tr. 69:69—77:5. Suffice it to say, she would have assigned a lower GAF score.

4               **f.   Analysis of Equitable Estoppel Argument**

5        The Court turns now to petitioner's equitable estoppel argument. To reiterate, petitioner

6   argues that his "delusions made him incapable of rationally understanding the necessity of filing a

7   timely habeas petition because before the delusions lifted, nothing anyone might say to him about

8   the need to timely file would have altered his behavior." Pet.'s Opp'n 5 ⁋ 11.

9        At the outset, there is no dispute that petitioner has been suffering from paranoid

10  schizophrenia and hallucinations since at least his entry into CDCR custody. It is also evident that

11  petitioner's symptoms were marked and they increased over time, made worse in part due to his

12  refusal to take his medication, a decision that itself appears to have been directly attributable to

13  his paranoid schizophrenia since he sometimes believed that he was being poisoned. Petitioner's

14  auditory hallucinations, which he experienced since he was 5 years old, were described as

15  "command" voices, directing him to hurt himself and/or others. His thought processes were

16  routinely described as "tangential" and "loose," his thought content was considered delusional by

17  multiple clinicians, and his speech was described as disorganized and rambling.

18       He was paranoid, believing that the government was tracking him, that people were

19  plotting against him, or that people wanted to hurt him, as in December 2004 when he was

20  convinced that his mother and other relatives were conspiring against him and withholding his

21  inheritance or when, on numerous occasions, he declined to take his medications because he

22  believed he was being poisoned. At times, he thought he was God or Superman or that he had

23  special powers. Additionally, he was often disconnected from reality, as when, in January 2005,

24  he requested to see a "Dr. Staples" who did not exist or when, in August 2007, he wrote a

25  rambling letter to then-Governor Schwarzenegger asking for a "mayorship."

26       Dr. Barragan, with extensive experience reviewing medical records and working with

27  mentally ill inmates, believed that petitioner's symptoms were so severe that he should have been

28  placed in the EOP level of care sooner than he was. She cautioned against assigning too much

29

weight to the GAF scores since they are no longer used because of their unreliability based, in part, on the different methods used by clinicians to assign the scores and because the scores did not always measure what it was supposed to measure. To highlight this point, she cited to several GAF scores that appeared inconsistent with petitioner's symptoms, and she provide her own alternative GAF scores:

- A GAF score of 55 on November 7, 2001, should have been in the range of 31-40;
- A GAF score of 55 on May 3, 2002, should have been closer to 40;
- A GAF score of 56 on May 1, 2003, should have been between 31-40;
- A GAF score of 61 on December 31, 2003, should have been closer to zero;
- A GAF score of 55 on December 23, 2004, should have been 38 or 40;
- A GAF score of 70 on September 21, 2005, should have been 40;
- A GAF score of 62 on March 2, 2007, should have been 38;
- A GAF score of 55 on March 29, 2007, should have been between 31 to 40;
- A GAF score of 60 on May 18, 2007, should have been 35 or 38;
- A GAF score of 60 on June 15, 2007, should have been 38 or 39;
- A GAF score of 60 on June 28, 2007, should have been 38;
- A GAF score of 60 on December 7, 2007, should have been 38; and
- A GAF score of 40 on July 1, 2008, should have been closer to 30.

In each of these instances, Dr. Barragan referred to symptoms that were, in her expert opinion, too severe to justify the high GAF scores. These symptoms included impaired reality testing, grandiose delusions, auditory and visual hallucinations, paranoia, disorganized and tangential thinking, problems with communication, and/or severe psychotic symptoms demonstrated by yelling and screaming in his cell. By focusing on the severity of these symptoms, Dr. Barragan suggested that the GAF scores were likely assigned based on the wrong measure. That measure, per Dr. Barragan, may have been the clinicians' motivation to retain petitioner in the CCCMS level of care, thereby assigning scores over 50 (the minimum cutoff for placement in the CCCMS program) even though his symptoms would have necessitated scores well under 50 – a "common practice" in Dr. Barragan's experience.

30

1    The Court will credit Dr. Barragan's testimony that petitioner's assigned GAF scores were

2    likely too high in some records considering the severity of petitioner's symptoms. With that said,

3    Dr. Barragan also testified that clinicians' approach to the assignment of GAF scores varied.

4    Whereas some complied with the DSM standard of construction by applying a GAF score that

5    was the lower of the two categories (symptoms and functioning), she acknowledged the

6    possibility that clinicians may have instead assigned a GAF score based on an average or an

7    amalgamation of the categories – that is, if an inmate's symptoms warranted a GAF score of 40

8    but his functioning warranted a GAF score of 70, a clinician may have chosen a number

9    somewhere in the middle.

10   This analysis thus leads to the determinative question here: has petitioner met the "high

11   threshold" to show that he was so mentally unwell (so symptomatic) that his illness prevented

12   him from filing his federal habeas petition any earlier? Following a thorough review of

13   petitioner's mental health records, briefs, and evidence submitted at the evidentiary hearing, the

14   Court is forced to conclude that petitioner has not met his burden. Here, the evidence does not

15   show that his symptoms or functioning during the limitations period were any different than the

16   previous periods when he had already demonstrated his ability to challenge his conviction

17   (whether thought a direct appeal or state habeas petitions) despite the severity of his symptoms.

18   This conclusion is highlighted by comparison to petitioner's mental health records for the period

19   immediately after the limitations period expired, which showed a marked exacerbation in

20   petitioner's symptoms and functionality, leading eventually to his placement in EOP.

21   Therefore, turning to petitioner's functionality, Dr. Barragan acknowledged that details

22   regarding petitioner's functioning were largely absent from the mental health records. She did

23   recognize that petitioner was able to take care of his activities of daily living, including eating,

24   showering, etc. Evid. Hr'g Tr. 105:20-25. She also acknowledged that, despite his symptoms, it

25   was possible (though unclear from the record) that petitioner was functional enough to challenge

26   his conviction and/or to seek help from other inmates and/or staff in pursuit of that goal. See, e.g.,

27   Evid. Hr'g Tr. 103:17—104:8, 108:4-9, 115:7—116:18.

28

1          But the Court need not entertain hypotheticals or possibilities or read between the lines

2    when addressing petitioner's level of functioning. This is because there is already unequivocal

3    evidence that, notwithstanding the severity of his symptoms, petitioner was sufficiently functional

4    to challenge his conviction during two specific periods of time: throughout his direct appeal and

5    throughout his state habeas petitions.

6          First, the evidence shows that petitioner was able to pursue his direct appeal from May

7    2001 through November 2003 and to communicate "often" with his attorney (see ECF No. 32-1

8    at 63) despite notations in his mental health records from multiple clinicians regarding his

9    paranoid schizophrenia; audio and visual hallucinations that caused him to yell at voices or that

10   commanded him to hurt himself or others; "delusions of believing he is God + that he can make

11   things happen to people by his thoughts" or that he has "special powers"; "poor judgment +

12   decision making," "slow process + poor cognition," "slow" intellectual functions, "poor"

13   organization of thought, "impaired" reality contact; racing thoughts, perpetual disturbance and

14   distortions; and paranoia that the "[government] is after [him]." Per Dr. Barragan, records from

15   this period listed symptoms that warranted GAF scores between 31 and 40, which would have

16   resulted in petitioner's exclusion from CCCMS and placement in EOP. But even if petitioner's

17   symptoms were so severe to warrant a more restrictive environment with a higher level of care,

18   the fact remains that petitioner was functional enough with lesser care to challenge his conviction

19   on direct review.

20         Similarly, between October 2003 and January 2005, petitioner was functional enough to

21   pursue two state habeas petitions and to consult with a friend who drafted one of the writs (see

22   ECF No. 32-2 at 2) despite notations in his mental health records revealing that he was "yelling

23   and screaming" in his cell, had "[visuals] of faces, words" "all the time"; had "command"

24   auditory hallucinations that directed him "to hurt self &/or others;" the "voices" were telling him

25   that he was God; he was "dissociative unstable"; had "both paranoid and grandiose delusions

26   about 'being special' and being sent to prison by his voices to keep him safe until he can take

27   over the world; believed that his mother and other relatives are conspiring against him and

28   withholding his inheritance; believed that his mother is able to see through his eyes and one of the

1   voices he hears is hers; had "rambling and tangential" speech; and had requested "to see Dr.

2   Staples (who does not exist)." Per Dr. Barragan, records from this period listed symptoms that

3   warranted GAF scores between zero and 40, which would have again resulted in petitioner's

4   exclusion from CCCMS and placement in EOP (or even an in-patient setting). But despite the

5   severity of his symptoms, the undisputed facts demonstrate that petitioner was still functional

6   enough to challenge his conviction on collateral review.

7        The limitations period (the interval between petitioner's state habeas petitions and then

8   from February 2005 to October 2005) is when petitioner was required to submit his federal

9   habeas petition, absent equitable tolling. For this period, his records reveal that he received GAF

10  scores ranging from an outlier low of 55 to a prolonged period of upper-60s and two 70s—the

11  highest scores in his entire mental health record. As compared to his earlier medical records,

12  petitioner's symptoms appear noticeably less pronounced during this period, which is not to say

13  that they were wholly absent. To the contrary, he had problems with his cellmate and wanted to

14  "end it all"; he was having "some definite signs of delusion and paranoia," but his "judgment and

15  insight are good"; he was "organized and goal directed" with some signs of delusions and

16  auditory hallucinations; he continued to exhibit paranoia; there were "no signs of internal

17  preoccupation," and his thought process was "clear and rational"; his thought process was

18  described as "flight" and his thought content was "delusion[al]." Dr. Barragan took issue with a

19  70-score on September 21, 2005. She claimed that, because petitioner's thought process was

20  described as "flight" and he had delusional thought content, his GAF score should have been 40

21  due to apparent difficulty communicating on account of disorganized thoughts and delusions.

22  These same issues, however, were present during the pendency of petitioner's direct review and

23  collateral challenges to his conviction. Arguably, these issues were more severe then.

24       Petitioner's mental health records during the final period noted here, which immediately

25  followed the expiration of the statute of limitations (i.e., October 2005 through June 2008),

26  starkly contrasts when the records from the preceding three periods (that of his direct appeal, that

27  of his state habeas petitions, and that of the limitations period). In this fourth and final period,

28  petitioner's GAF scores started in the mid-60s, transitioned to 60 for the majority of 2007, and

then dropped steeply until it was determined that he needed a higher level of care. At the beginning of this period, the mental health notes reveal that his cognition was within normal limits, but he had "poor reality testing," and his insight, judgment, and concentration were "poor." His thought process and thought content were within normal limits, he was cooperative, he had appropriate affect, and he was oriented as to people, place, and time. Over time, and with increased medication non-compliance, his auditory hallucinations increased, to the point where he felt he was "responding too much to them"; he "seem[ed] genuinely mentally ill"; and he was having "loud conversations [with] his voices + states his voices are getting out of hand." In early-2007, petitioner had not been taking his psych meds for several months, which resulted in an increase in psychotic signs and symptoms. His thought process transition from "normal limits" to "tangential," "circumstantial," and "disordered"; his thought content was delusional; and his thought disorder had increased.  He wrote a "long rambling letter" to then-Governor Schwarzenegger to release him and give him a "mayorship." By mid-May 2008, his paranoia and symptoms increased; he continually refused to take his medications because "someone might put poison in them." He had "mildly loose speech (worse when not answering structured questions)."

At this point, the decision was made to transfer petitioner to EOP. Upon his entry in that program, it was noted that petitioner had been "pacing, yelling, challenging his cell mate to fight, standing over him at night while staring and gritting his teeth. He also had a sharpened toothbrush." He "thought people are plotting against him," he experienced "thought broadcasting," his "[t]houghts were disorganized, often speaking in word salad, using words together in nonsensical sentences, mostly with paranoid themes." By late-2008, he was observed talking to a wall. By then, his Treatment Team decided to continue petitioner in the EOP level of care due to his "continued disorganization, intermittent paranoia, delusions, and difficulty programming."

For these reasons, the Court finds that petitioner has not demonstrated that his mental illness during the running of the statute of limitations prevented him from understanding the need to timely file a federal petition or from taking steps to effectuate this filing.

////

1   **IV.   Conclusion**

2          Accordingly, **IT IS HEREBY RECOMMENDED** that respondent's motion to dismiss

3   (ECF No. 22) be granted.

4          These findings and recommendations are submitted to the United States District Judge

5   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

6   after being served with these findings and recommendations, any party may file written

7   objections with the court and serve a copy on all parties.  Such a document should be captioned

8   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

9   objections shall be filed and served within fourteen days after service of the objections.  The

10  parties are advised that failure to file objections within the specified time may waive the right to

11  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

12  Dated:  June 24, 2020

13

14                                              _____

15  /DLB7;                                      DEBORAH BARNES
    DB/Inbox/Substantive/hayd1004.mtd sol           UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28